Richard G. Grant
Tex. Bar No. 08302650
CM LAW PLLC
National Litigation Support Center
13101 Preston Road, Suite 110-1510
Dallas, Texas 75240
Telephone: 214-210-2929
Email: rgrant@cm.law

ATTORNEYS FOR
DEBTOR IN POSSESSION

UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 25-40248-ELM-11 |
| | § | Chapter 11 (Subchapter V) |
| PIVOTAL MED SUPPLY, LLC, | § | |
| | § | |
| Debtor. | § | |
| | § | |

**DEBTOR' MOTION FOR INTERIM AND FINAL ORDERS PURSUANT TO SECTIONS  105, 361, 362, 363, 364 AND 507 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 2002, 4001 AND 9014 (I) AUTHORIZING THE DEBTOR (A) TO OBTAIN POSTPETITION FINANCING AND (II) GRANTING (A) ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES AND (B) RELATED RELIEF**

The above-captioned Debtor and Debtor-in-possession (collectively, the "Debtor") by and through its undersigned attorneys, hereby file this motion (the "Motion"), pursuant to Sections  105, 361, 362, 363, 364, and 507 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, and 9014, for entry of an interim order substantially in the form attached hereto as **Exhibit A** (the "Interim DIP Order") and a final order (the "Final DIP Order", together with the Interim DIP Order, the "DIP Orders") (i) authorizing the Debtor to obtain postpetition financing consisting of a super-priority, junior lien, revolving credit facility in the amount of $300,000 (the "DIP Facility") and substantially on the terms set forth in the DIP Financing Agreement attached hereto as **Exhibit C** (as amended, supplemented, or otherwise modified and in effect, from time to time, the "DIP Loan Agreement," together with any and all other related documents and

agreements entered into in connection with or related to the DIP Facility, the "DIP Loan

Documents")[1] and the Interim DIP Order; (iii) scheduling a final hearing pursuant to Bankruptcy

Rule 4001 (the "Final Hearing"); and (v) granting related relief. In support of the relief requested

in this Motion, the Debtor rely on the *Declaration of Noah Seitel in Support of First-Day*

*Pleadings* (the "First Day Declaration"). In further support of the relief requested in the Motion,

the Debtor respectfully represents as follows:

### JURISDICTION

1.          This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334.

This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of these

proceedings and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409. The

statutory bases for the relief requested herein are sections 105, 363, 364, 503 and 507 of title 11

of the United States Code (the "Bankruptcy Code") and the local rules of this Court (the "Local

Rules").

### BACKGROUND

2.          On January 23, 2025 (the "Petition Date"), the Debtor filed a voluntary petition

for relief with the Court under chapter 11 of the Bankruptcy Code. The Debtor is operating its

business and managing its property as debtor in possession pursuant to sections 1184 of the

Bankruptcy Code.  As of the date of filing hereof, the Subchapter V Trustee has not yet been

appointed.  No request for the appointment of a trustee or examiner has been made in this

Subchapter V chapter 11 case, and no committees have been appointed or designated.

---

[1] The proposed form of DIP Loan Documents are attached hereto collectively as **Exhibit C**. At or prior to the final
hearing hereon, the Debtor will file a supplement to this Motion reflecting any changes to the DIP Loan Documents.

3.       The Debtor is a retail distributor (through prescription) of wound care solutions such as Alginate, Collagen, Foam and Hydrogel Dressings and Compression Garments.  Further information regarding the Debtor's business is found in the Declaration of Noah Seitel in Support of First Day Motions filed contemporaneously herewith (the "First Day Declaration").

4.       Attached hereto as **Exhibit B** is the Debtor's projection of cash sources and uses over the upcoming five-week period commencing January 27, 2025.  The Debtor projects cash shortfalls of approximately $114,000.

## SUMMARY OF RELIEF REQUESTED

5.       The Debtor seeks approval of a revolving DIP Loan Facility in the amount of $300,000 (including $120,000 on an interim basis) to support payment of business expenses and administrative costs to facilitate the sale or reorganization of the Debtor' businesses and conclusion of this Chapter 11 proceeding.

## SUMMARY OF DIP LOAN FACILITY

6.       Bankruptcy Rule 4001 requires that motions requesting authority to incur postpetition financing begin with a concise statement of the relief requested, summarizing the material terms and setting forth where the material terms can be found in the relevant documents. Such summary is set forth below.

| Item | Description |
|------|-------------|
| Lender | Noah Seitel and Gregory See or their designated affiliate. Lenders are the sole members of the Debtor |
| Borrowers | The Debtor |
| Facility Amount | $300,000 funded in one or more requests prior to dismissal, conversion or appointment of a Chapter 11 Trustee on a revolving basis upon interim approval of Bankruptcy Court |
| Interest Rate: | 14% per annum simple interest (or any lesser maximum amount permitted by applicable law) |

| | |
|---|---|
| Term: | Obligations under facility mature 1 year from the date of entry of the interim order hereon or earlier upon dismissal, conversion or the appointment of a Chapter 11 Trustee |
| Payment: | Payable in a single installment of principal and accrued but unpaid interest on the Maturity Date |
| Use of Proceeds/Budget: | Operational capital for postpetition operations pending exit from Chapter 11 and administrative expenses |
| Financing Contingency | Bankruptcy court approval under 11 U.S.C. §364(d) is required for DIP financing to begin, and Lender to review and approve all motions, order and filings related to the DIP financing. |
| Collateral: | Under 11 U.S.C. §364(d), Lender will be granted, and the Bankruptcy Court will approve, a super priority junior security interest in all of the Client's personal property and unexpired leases (other than actions under Chapter 5 of the Bankruptcy Code). |
| Early Payment Fee: | None |
| Carve-Out | For professional fees and expenses, personal property ad valorem tax liens and landlord liens. |
| Representations and Warranties | None |
| Origination Fee: | None |
| Documentation: | Promissory Note, Security Agreement and Collateral Assignment of Lease as to each business location |
| Lien | The DIP Facility would receive a junior lien on all property of the estate (other than causes of action under Chapter 5 of the Bankruptcy Code) pursuant to 11 U.S.C. § 364(d) and (c)(2) |
| Superpriority Status | The DIP Facility would have superpriority status under 11 U.S.C. § 364(c)(1), subject to the Carve Out |
| Adequate Protection of Allowed Prepetition Liens | There are no prepetition liens.  The liens granted hereunder are junior to any perfected prepetition liens. |
| Determination of the validity, enforceability, priority, or amount of a claim | None |
| Waivers | The DIP Facility does **not** require (a) waivers or modification of Code provisions or applicable rules relating to the automatic stay; (b) waivers or modification of any entity's authority or right to file a plan, seek an extension of time in which the debtor has the exclusive right to file a plan, request the use of cash collateral under §363(c), or request authority to obtain credit under §364; (c) a waiver or modification of the applicability of nonbankruptcy law relating to the perfection of a lien on property of the estate, or on the foreclosure or other enforcement of the lien; or (d) a release, waiver, or limitation on any claim or other cause of action belonging to the estate or the trustee, including any modification of the statute of limitations or other deadline to |

|  | commence an action; (e) a release, waiver, or limitation of any right under §506(c); or (f) the indemnification of any entity. |
|---|---|
| Milestones | The DIP Facility does not require the establishment of deadlines for filing a plan of reorganization, for approval of a disclosure statement, for a hearing on confirmation, or for entry of a confirmation order |
| Estate Claims | The DIP Facility does not require the granting of a lien on any claim or cause of action arising under §§544, 1 545, 547, 548, 549, 553(b), 723(a), or 724(a). |
| Covenants | n/a |
| Events of Default | The Promissory Note provides that a default includes (a) default in payment upon any identified Maturity Date hereof as the same becomes due and such default is not cured within ten (10) days after written notice to Borrower; or (b) default under the terms of any instrument securing this Note and such default is not cured within ten (10) days after written notice to Borrower at the address set forth above, then in either such event the holder of this Promissory Note may without further notice, declare the remainder of the principal sum, together with all interest accrued thereon and, the prepayment premium, if any, at once due and payable upon written notice to Borrower. |
| Interim Relief | On an interim basis, the Debtor requests borrowing up to the amount of $120,000 secured by superpriority status and junior liens on the Debtor's assets |

## **PREPETITION SECURED CLAIMS**

7.      There are no known secured claimants of the Debtor other than (a) ad valorem personal property tax claims; and (b) landlord liens.  Such claims are de minimis.  Lender agrees to a carve-out from the liens requested herein for the payment of such claims

## **RELIEF REQUESTED**

8.      By this Motion, the Debtor seeks entry of the Interim DIP Order, inter alia:

a)      pursuant to Sections 364(c) and (e) of the Bankruptcy Code, authorizing the Debtor to obtain postpetition financing under the DIP Facility.

b)      pursuant to Sections 363 and 364 of the Bankruptcy Code, authorizing the Debtor to use the proceeds of the DIP Facility for, among other things, working capital requirements and general corporate purposes, payment of costs of administration of these cases and payment of adequate protection payments and any other payments permitted by this Court;

c)   pursuant to Sections 364(c)(2) and (c)(3) of the Bankruptcy Code, as security for the borrowings under the DIP Loan Agreement, authorizing the Debtor to grant the DIP Lenders a perfected junior lien on all the Debtor' assets other than Chapter 5 causes of action;

d)   authorizing the Carve-Out;

e)   during the Interim Period, authorizing the Debtor to borrow up to an aggregate principal amount of $120,000 subject to, and in accordance with the DIP Loan Agreement and the Interim DIP Order; and

f)   pursuant to Bankruptcy Rule 4001, scheduling the Final Hearing to consider entry of the Final DIP Order.

9.      The Debtor believe that the funding available under the DIP Facility will reasonably address its near-term financing requirements and constitute the best financing option available to them given the circumstances of its business and these Chapter 11 cases.

## OBTAINING CREDIT PURSUANT TO
## SECTION 364(C) OF THE BANKRUPTCY CODE

10.     Section 364(c) of the Bankruptcy Code allows a debtor to obtain credit or incur debt on an unsecured super-priority basis. Section 364(c) also allows a debtor to obtain credit or incur debt secured by liens on unencumbered property and junior liens on encumbered property. See 11 U.S.C. § 364(c). The requirement under the Bankruptcy Code for obtaining postpetition credit under Section 364(c) is a finding, made after notice and a hearing, that the Debtor are unable to obtain secured credit allowable under Bankruptcy Code Section 503(b)(1). *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990); *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987). Courts have applied a three-prong test to determine whether a debtor has met the statutory requirements to obtain financing under Section 364(c):

a)   The Debtor is unable to obtain unsecured credit under Section 364(b) of the Bankruptcy Code by allowing a lender only a claim for administrative expenses;

b)   The transaction is necessary to preserve the assets of the estate; and

    c)      The terms of the transaction are fair, reasonable and adequate, given the circumstances of the debtor and the prospective lender.

11.     Here, the Debtor is unable to obtain unsecured credit under Section 364(b) from a lender agreeable to only a claim for administrative expense.  The Debtor will be unable to make payroll and continue business operations absent the funding.  The terms of the transaction are fair, reasonable and adequate under the circumstances and are better than alternate forms of available financing.

12.     The Lender here has agreed to a lien subordinate to any perfected liens held by prepetition secured lenders.  Accordingly, the Debtor only requests approval of secured financing under 11 U.S.C. § 364(c) with a junior lien on the debtor's assets.  As the Lender has agreed to a lien subordinate to that of existing perfected liens, no adequate protection is required of any existing perfected lienholders.

## THE COURT SHOULD APPROVE THE DIP FACILITY

13.     When the Debtor determined that it was necessary to commence these cases to allow them to operate as a going concern and to preserve the value of its business enterprise, the Debtor endeavored to identify potential sources of postpetition financing. Based on discussions with several potential third-party lenders, the Debtor determined that adequate postpetition financing solely on an unsecured or a junior priority basis to the Prepetition Lenders was not possible. Without access to postpetition financing, the Debtor would be unable to operate and auction its businesses as a going concern. Such a result would likely cause the Debtor to cease operations and destroy the value of its business enterprise, to the detriment of all parties-in-interest. Through the DIP Facility, the Debtor would be able to preserve the going concern value of its assets throughout the duration of these cases and auction the same. Moreover, the terms of

the DIP Facility are fair and reasonable given the Debtor' circumstances and reflect the exercise

of its sound business judgment, as is consistent with its fiduciary duties.

**The DIP Facility is Necessary to Preserve the Value of the Debtor' Estates**

14.     The DIP Facility is necessary to preserve and maintain the value of the Debtor'

estates and the collateral securing the Prepetition Facility. If the Debtor does not receive the

additional liquidity to fund its ongoing operations as provided by the DIP Facility, they may be

forced to cease, or, at a minimum, significantly curtail its operations, such that it may not be able

to avoid a forced liquidation of its assets. In that case, its assets would in all probability be sold

for sufficiently less than the Debtor' going-concern value to the detriment of all parties-in-

interest. *See In re Sun Healthcare Groups, Inc.*, 245 B.R. 779, 781 (Bankr. D. Del. 2000) (noting

that the court had approved debtor-in-possession financing to "permit the Debtor to continue to

operate to preserve its estates").

**The Terms of the DIP Loan Agreement are Fair, Reasonable, and Appropriate**

15.     Given the Debtor' current circumstances, the terms of the DIP Facility are fair and

reasonable. The Debtor has made a concerted effort in good faith to obtain credit on the most

favorable terms available. Despite the Debtor' broad search, no other lender was willing to

provide a stand-alone facility on better terms.

<u>**APPLICATION OF THE BUSINESS JUDGMENT STANDARD**</u>

16.     As described above, after appropriate investigation and analysis, the Debtor'

management and advisors have concluded that the DIP Facility provides the best alternative

available under the circumstances of these Chapter 11 cases. Bankruptcy courts routinely defer to

a debtor's business judgment on most business decisions, including the decision to borrow

money, unless such decision is arbitrary and capricious. *See In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that the interim loan, receivables facility, and asset-based facility were approved because (i) they "reflect[ed] sound and prudent business judgment on the part of [the debtor]" and (ii) "[were] reasonable under the circumstances and in the best interest of [the debtor] and its creditors"). In fact, "[m]ore exacting scrutiny [than the business judgment standard] would slow the administration of the Debtor's estate and increase its costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

17.     The Debtor has exercised sound business judgment in determining that a postpetition credit facility along the lines of the DIP Facility is appropriate and has satisfied the legal prerequisites to incur debt under the DIP Facility. Accordingly, the Court should grant the Debtor the authority to enter into the DIP Facility and obtain funds from the DIP Lenders on the secured and administrative super-priority basis described above, pursuant to Sections 364(c).

## WAIVER OF BANKRUPTCY RULE 6004(H)

18.     On account of the immediate and pressing need for the Debtor to obtain postpetition financing to preserve the value of its estates and continue to remain in business as a going concern, the Debtor request a waiver of the 14-day period set forth in Bankruptcy Rule 6004(h), and any other similar stays under the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, and any applicable orders of this Court.

## **SATISFACTION OF BANKRUPTCY RULE 4001[(B)(2) AND] (C)(2)**

19.     Pursuant to Bankruptcy Rule 4001(c)(2), the Court may commence a hearing on a motion to obtain credit and to authorize such credit within the 14 days of the filing of the Motion only if that relief is necessary to avoid immediate and irreparable harm. Permitting the Debtor to obtain postpetition financing on the terms set forth herein or in any order approving this Motion on an interim or final basis is necessary to avoid the immediate and irreparable harm that could occur if the Debtor were unable to obtain postpetition financing. Accordingly, the Debtor submits that they have satisfied the requirements of Bankruptcy Rule 4001(c)(2) with respect to the relief requested in this Motion.

## **CONCLUSION**

**WHEREFORE,** the Debtor respectfully requests (i) entry of the Interim DIP Order, (ii) entry of the Final DIP Order after the Final Hearing, and (iii) granting such other and further relief as this Court may deem just and proper.

Dated: January 27, 2025

Respectfully Submitted,

CM LAW, PLLC


By:    /s/ Richard Grant
        Richard G. Grant
        Tex. Bar No. 08302650

National Litigation Support Center
13101 Preston Road, Suite 110-1510
Dallas, Texas 75240
Telephone: 214-210-2929
Email: rgrant@cm.law

ATTORNEYS FOR
PIVOTAL MED SUPPLY, LLC

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that he has transmitted a true and correct copy of the foregoing (a) via the Court's Electronic Case Filing system to all persons participating therein on January 27, 2025 and (b) in the manner and on the dates specified in the Certificate of Service of First Day Motions filed contemporaneously herewith, to the (i) the Office of the United States Trustee for the Northern District of Texas; (ii) the Debtors' secured creditors; (iii) the Debtors' twenty largest unsecured creditors; (iv) those persons who have formally appeared in this case and requested service pursuant to Bankruptcy Rule 2002; (v) the Internal Revenue Service; (vi) the Subchapter V Trustee, if appointed; and (vii) all other applicable government agencies to the extent required by the Bankruptcy Rules or the Local Rules.

                         /s/ Richard Grant
                       Richard G. Grant

# EXHIBIT A
# PROPOSED INTERIM ORDER

UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 25-40248-ELM-11 |
| | § | Chapter 11 (Subchapter V) |
| PIVOTAL MED SUPPLY, LLC, | § | |
| | § | |
| Debtor. | § | |
| | § | |

## INTERIM ORDER APPROVING DIP FINANCING

This matter is before the Court on the above-captioned debtor and debtor-in-possession

(the "Debtor") on the *Debtor' Motion for Interim and Final Orders Pursuant to Sections  105,*

*361, 362, 363, 364 and 507 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001 and 9014*

*(I) Authorizing the Debtor (a) to Obtain Postpetition Financing and (II) Granting (a) Adequate*

*Protection to Prepetition Secured Parties and (B) Related Relief* (the "DIP Financing Motion")[1]

requesting entry of interim and final orders granting junior security interest and liens and

---

[1] All terms utilized, but not defined, herein shall have the meaning afforded such term in the DIP Financing Motion.

according super priority claim status under Section 364(c) of the Bankruptcy Code in favor of a

designated affiliate of Noah Seitel and Gregory See ("DIP Lender"). Based upon this Court's

review of the DIP Financing Motion, the record, and all matters brought to the Court's attention

at the a hearing held pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2), and after due

deliberation and consideration, the Court makes the following findings of fact and conclusions of

law applicable to the financing sought by Debtor from DIP Lender and Debtor' request to use

cash collateral (to the extent any findings of fact constitute conclusions of law, they are adopted

as such, and vice versa):

THE COURT HEREBY FINDS AND DETERMINES:

    A.      On January 23, 2025 (the "Petition Date"), the Debtor filed a voluntary petition

for relief under the Bankruptcy Code in this Court (the "Chapter 11 Case" or "Case"). The

Debtor are continuing to operate their businesses and manage its property as a debtor-in-

possession. No trustee or examiner has been appointed herein.

    B.      An immediate and ongoing need exists for the Debtor to obtain financing to

continue the operation of its business as a debtor-in-possession under Chapter 11 of the

Bankruptcy Code, to minimize the disruption of the Debtor' business and to allow the Debtor to

pursue the reorganize its business operations, preserve the going concern value of the estate, and

complete this Chapter 11. Despite diligent efforts, the Debtor has been unable to obtain financing

in the form of unsecured credit allowable under Section 503(b)(l) of the Bankruptcy Code as an

administrative expense or solely in exchange for the grant of a special administrative expense

priority pursuant to Section 364(c)(l) of the Bankruptcy Code. The Debtor has been able to

obtain financing in the form of credit secured by liens that are junior to existing liens on property

of the estates pursuant to Sections 364(c)(2) and (c)(3) of the Bankruptcy Code.

D.      The Debtor have requested that DIP Lender establish a new secured facility in favor of Debtor (the "DIP Facility") pursuant to which Debtor may obtain advances from time to time (the "DIP Advances") up to $300,000 in advances outstanding, upon the terms and conditions set forth herein and in the DIP Loan Agreement which is attached to the DIP Financing Motion as **Exhibit C** (the "DIP Loan Agreement").

E.      DIP Lender is willing to make advances (the "DIP Advances") under the DIP Loan Agreement, upon the terms and conditions set forth herein and the DIP Loan Agreement on an interim basis until such time that the parties can execute final agreements and this Court can enter a final order on the DIP Financing Motion. DIP Lender's willingness to make the DIP Advances and other extensions of credit on an interim basis (collectively, the "DIP Advances") is conditioned upon the DIP Lender receiving a security interest in and lien upon (the "DIP Liens") all of the Debtor' assets (both real and personal), including, without limitation, the Debtor' accounts, inventory, equipment, fixtures, general intangibles, documents, instruments, chattel paper, deposit accounts, letter-of- credit rights, commercial tort claims, contract rights, investment property, leasehold interests, supporting obligations, cash, and books and records relating to any assets of the Debtor and all cash and non-cash proceeds (including insurance proceeds) of the foregoing, whether now in existence or hereafter created, acquired or arising and wherever located (all such real and personal property, and the proceeds thereof, being collectively hereinafter referred to as the "Collateral").  The Collateral shall not include any claim or cause of action arising under §§544, 1 545, 547, 548, 549, 553(b), 723(a), or 724(a) (collectively, the "Avoidance Claims") and the proceeds thereof (the "Avoidance Proceeds").

F.      The Debtor have certified that a copy of the DIP Financing Motion (together with copies of the DIP Loan Agreement) which provided notice of the Interim Hearing have been properly served upon the U.S. Trustee, any known secured creditors of Debtor, and all parties

requesting notice. The Court finds that notice of the DIP Financing Motion, as it relates to this

Interim Order, is sufficient for all purposes under the Bankruptcy Code and the Bankruptcy

Rules, including, without limitation, Sections 102(1) and 364 of the Bankruptcy Code and

Bankruptcy Rule 4001 (b) and (c).

      L.     Good cause has been shown for the entry of this Interim Order and authorization

for Debtor to obtain advances pursuant to the DIP Loan Agreement. The Debtor' need for

financing of the type afforded by the DIP Loan Agreement remains immediate and critical. Entry

of this Interim Order will minimize disruption of the Debtor' business and operations, will

preserve the assets of the Debtor' estates and is in the best interests of the Debtor, its creditors

and its estate.  The terms of the proposed financing and use of Cash Collateral are fair and

reasonable, reflect the Debtor' exercise of business judgment and are supported by reasonably

equivalent value and fair consideration.

      M.    Based upon the statements and any evidence presented at the Interim Hearing on

the DIP Financing Motion, and the record in this Case as a whole, the terms of the DIP Loan

Agreement and this Interim Order have been negotiated in good faith between the Debtor, on the

one hand, and DIP Lender, on the other. Therefore, all DIP Advances to the Debtor pursuant to

the DIP Loan Agreement shall be deemed to have been made in good faith within the meaning of

Section 364(e) of the Bankruptcy Code.

      N.     This Court has jurisdiction to enter this Interim Order pursuant to 28 U.S.C. §§

157(b) and 1334. Consideration of the DIP Financing Motion constitutes a core proceeding, as

defined in 28 U.S.C. § 157(b)(2).

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED as follows:

1.      The DIP Financing Motion is GRANTED, as set forth herein, on an interim basis. Any objections to the DIP Financing Motion which were not withdrawn at or before the Interim Hearing or otherwise resolved by this Interim Order are hereby overruled.

2.      Capitalized terms not otherwise defined herein shall have the meanings given to them in the DIP Financing Motion.

3.      The Debtor are authorized to take DIP Advances in accordance with the DIP Loan Agreement from time to time and the DIP Lender shall fund such DIP Advances up to an aggregate advance amount outstanding at any time not to exceed $120,000.00 pending final hearing hereon, and to incur any and all liabilities and obligations thereunder and to pay all charges, fees, expenses and other accruals and to satisfy all conditions precedent and perform all obligations hereunder and thereunder in accordance with the terms hereof and thereof.

4.      The Debtor are authorized to use the DIP Advances in the ordinary course of the Debtor' business for the purposes of supporting the Debtor' ongoing working capital needs and administrative expenses.

5.      All DIP Advances, together with all charges, fees and other accruals (including, without limitation, reasonable legal fees) at any time or times payable by Debtor to DIP Lender in connection therewith or otherwise related to the DIP Loan Agreement (all such DIP Advances, interest fees and other charges, including any "Obligations" as such term is defined in the DIP Credit Agreement, are collectively called the "DIP Obligations") shall be, and hereby are, secured by security interests and liens in favor of DIP Lender with respect to all of the Collateral (collectively, the "DIP Liens"). The DIP Obligations shall have super priority pursuant to Section 510(a) of the Bankruptcy Code, and the DIP Liens shall be junior in priority to all perfected pre-

petition liens and security interests with respect to any of the Collateral, but subject to the Carve Out (as defined herein).

6.       The DIP Liens shall be deemed valid, binding, enforceable and perfected upon entry of this Interim Order. DIP Lender shall not be required to file any UCC-1 financing statements, mortgages, deeds of trust, intellectual property filings, security deeds, notices of lien or any similar document or take any other action (including possession of any of the Collateral) in order to validate the perfection of the DIP Liens. DIP Lender may, in its discretion, file a certified copy of this Interim Order in any filing office in any jurisdiction in which Debtor is organized or has or maintains any Collateral or an office, and each filing office is directed to accept such certified copy of this Interim Order for filing and recording.

7.       As used in this Interim Order, the "Carve Out" shall encompass the following fees and expenses, except to the extent otherwise agreed by the DIP Lender in writing: (i) allowed fees and reimbursement of expenses of professionals retained by the Debtor (collectively, the "Debtor Professionals"); and (ii) fees and expenses payable to any asset brokers/investment bankers ("Broker"). The properly perfected liens of the DIP Lender in any Collateral, including any DIP Liens, and any superpriority claim shall be junior in payment and priority to the Carve Out.

11.      All reasonable costs and expenses incurred by DIP Lender in connection with the negotiation and drafting of the DIP Financing Documents, or any amendments thereto, including, without limitation, all filing and recording fees and reasonable fees and expenses of attorneys, accountants, appraisers and other professionals incurred by DIP Lender in connection with any of the foregoing, shall form a part of the DIP Obligations and shall be paid by Debtor in accordance with the terms of the DIP Financing Documents. Fees and expenses incurred by

professionals retained by DIP Lender are subject to this Court's approval pursuant to separate

Order of the Court.

12.    This Interim Order shall constitute a valid, binding obligation of the Debtor

enforceable against the Debtor in accordance with its terms.

13.    The automatic stay provisions of Section 362 of the Bankruptcy Code are hereby

lifted and terminated as to DIP Lender to the extent necessary to implement the provisions of this

Interim Order and the DIP Loan Agreement, to file or record any UCC-1 financing statements,

mortgages, deeds of trust, security deeds and other instruments and documents evidencing or

validating the perfection of the DIP Liens.

14.    Neither DIP Lender nor the Debtor shall be required to take any action or obtain

any additional orders to enjoy the benefits and/or protections of this Interim Order. Nothing

herein is intended, however, to waive any rights of DIP Lender to request any relief it may

believe is appropriate, including to seek additional adequate protection of its interests in its

collateral, relief from the automatic stay, conversion of the cases, to propose a plan of

reorganization or liquidation, or any other relief or remedies that may be available to DIP Lender

under bankruptcy or non- bankruptcy law.

15.    The notice given by the Debtor of the DIP Financing Motion and the Interim

Hearing on the DIP Financing Motion constitutes due and sufficient notice in accordance with

the Bankruptcy Rules and the Local Rules of this Court.

19.    **Notice of Final Hearing; Service of Order**. A final hearing on the DIP

Financing Motion will be held on _____ at _____ **m. CT** (the "Final Hearing").

Objections to the relief requested shall be filed with the Court and served upon counsel for the

Debtor no later than **five (5) business days** prior to the Final Hearing.  Promptly after the entry

of this Interim Order, the Debtor shall serve a copy of this Interim Order on the Office of the

United States Trustee and the Debtor' known secured creditors, and the Debtor shall file a

certificate of service regarding same with the Clerk of the Court. Such service shall constitute

good and sufficient notice of the Final Hearing.

<<< END OF ORDER >>>

Submitted by:

Richard G. Grant
CM LAW PLLC
National Litigation Support Center
13101 Preston Road, Suite 110-1510
Dallas, Texas 75240
Telephone: 214-210-2929
Email: rgrant@cm.law

COUNSEL FOR DEBTOR IN POSSESSION

**<u>EXHIBIT B</u>**
**<u>CASH FLOW PROJECTIONS</u>**

13 Week Cash Flow

Pivotal Med Supply, LLC

| | Week Beginning 1/27/2025 | WB 2/3/2025 | WB 2/10/2025 | WB 2/17/2025 | WB 2/24/2025 |
|---|---|---|---|---|---|
| Beginning Cash | $ 86,000.00 | $ (20,014.00) | $ 11,821.00 | $ (113,884.00) | $ (53,884.00) |
| **Collections** | | | | | |
| Insurance Collections | $ 60,000.00 | $ 70,000.00 | $ 65,000.00 | $ 60,000.00 | $ 60,000.00 |
| Agency Commisions | $ 95,000.00 | | | | 85000 |
| **Expenses** | | | | | |
| Hourly Payroll | $ 4,650.00 | | $ 4,650.00 | | $ 4,650.00 |
| Salary Payroll | $ 131,055.00 | | $ 131,055.00 | | $ 80,650.00 |
| Travel Reimbursement | $ 20,000.00 | | $ 20,000.00 | | $ 15,000.00 |
| Commissions | $ 105,309.00 | | $ 35,000.00 | | $ 35,000.00 |
| Rent Roswell | | $ 14,975.00 | | | |
| Rent Southlake | | $ 4,650.00 | | | |
| Supply Purchases | | $ 15,000.00 | | | |
| ECF Data (Microsoft) | | $ 1,340.00 | | | |
| Microsoft | | $ 2,200.00 | | | |
| **Increase(Decrease)** | $ (106,014.00) | $ 31,835.00 | $ (125,705.00) | $ 60,000.00 | $ 9,700.00 |
| **Ending Cash** | $ (20,014.00) | $ 11,821.00 | $ (113,884.00) | $ (53,884.00) | $ (44,184.00) |

## EXHIBIT C
## PROPOSED DIP LOAN AGREEMENT AND LOAN DOCUMENTS

# DIP FINANCING AGREEMENT

Noah Seitel and Gregory See or their designated affiliate ("Lender") hereby agrees to provide debtor-in-possession financing to Pivotal Med Supply, LLC, a Texas limited liability company (Case No. 24-40248, Bankr. N.D. Tex.) ("Borrower"). This DIP Financing Agreement ("Agreement") sets forth the terms and conditions pertaining to the financing. The parties hereto do hereby agree as follows:

| | |
|---|---|
| **Financing Contingency** | Bankruptcy court approval under 11 U.S.C. §364(d) is required for DIP financing to begin, and Lender to review and approve all motions, order and filings related to the DIP financing. |
| **Facility Amount** | Up to $300,000 in such amounts as may be requested by the debtor in possession and agreed to by Lender from time to time prior to dismissal, conversion or appointment of a Chapter 11 Trustee. |
| **Use of Proceeds:** | Operational capital for postpetition operations and administrative expenses pending exit from Chapter 11 |
| **Collateral:** | Under 11 U.S.C. §364(d), Lender will be granted, and the Bankruptcy Court will approve, a super priority junior security interest in all of the Client's personal property and unexpired leases (other than Chapter 5 Actions). |
| **Term:** | 1 year |
| **Interest Rate:** | 15% per annum compound interest (or any lesser maximum amount permitted by applicable law) |
| **Payment:** | Interest is payable monthly. The remaining balance is payable in a single installment of principal and accrued but unpaid interest on the Maturity Date. |
| **Early Payment Fee:** | None |
| **Carve-Out** | For professional fees and expenses |
| **Attorneys' Fees:** | Reasonable attorneys' fees and costs incurred by Lender in legal review of Documentation payable on the Maturity Date not to exceed $10,000 |
| **Covenants** | Borrower agrees to provide monthly budgets (each, a "**Budget**") to Lender at least 5 business days prior to the first day of each month and also to provide variance reports with respect to said budget within 10 business days following the reporting month. |
| **Representations and Warranties** | None |
| **Origination Fee:** | None |
| **Documentation:** | Promissory Note, Security Agreement and Collateral Assignment of Lease as to each business location |

This Agreement sets forth Lender's commitment to provide financing upon the terms described herein for the purpose of providing interim financing to the Client, and the Client and Lender agree to execute the Documentation described above. The Documentation shall set forth the legal relationship between the parties with more specificity.

Date: January 27, 2025

_____

NOAH SEITEL


_____

GREGORY SEE

PIVOTAL MED SUPPLY, LLC


By: _____
               Noah Seitel, Managing Member

# PROMISSORY NOTE

**January 27, 2025**

FOR VALUE RECEIVED, **PIVOTAL MED SUPPLY, LLC,** a Texas limited liability company ("Borrower") promises to pay to [Lender]  (the "Lender") or order, the sum of Three-Hundred Thousand Dollars ($300,000.00) in principal with interest on the Principal from the date hereof, at the rate of the lesser of (a) (15%) per annum and (b) the highest interest rate permissible under applicable law, on the unpaid balance until paid or until default, both principal and interest payable in lawful money of the United States of America, at such place as the legal holder hereof may designate in writing.  This Note shall be governed by and subject to the terms of the DIP Financing Agreement of even date herewith between Lender and Borrower  It is understood and agreed that additional amounts may be advanced by the holder hereof as provided in the instruments, if any, securing this Promissory Note (the "Note") and such advances will be added to the principal of this Note and will accrue interest at the above specified rate of interest from the date of advance until paid.  The principal amount, together with all accrued and unpaid interest thereof, shall be fully and finally due and payable on first anniversary hereof (the "Maturity Date").

Interest shall accrue monthly on the principal amount still outstanding and owed from Borrower to Lender.  All amounts owed pursuant to this Note (including accrued and accruing interest and attorneys' fees as provided for herein) are intended by the parties to be secured by a lien on all of Borrower's assets, both tangible and intangible, whether presently owned or hereafter acquired, and a collateral assignment of Borrower's interests in lease agreements under which it is a tenant, as well as the granting to Lender of a security interest pursuant to a Security Agreement of even date herewith.

Unless otherwise provided, this Note may be prepaid in full or in part at any time without penalty or premium.  Payments shall be applied first to fees and expenses outstanding (including attorneys' fees), if any, then to accrued interest, then to principal.

In the event of (a) default in payment upon any obligation hereof as the same becomes due and such default is not cured within ten (10) days after written notice to Borrower (which shall be effective as of the date mailed by electronic mail addressed to Borrower at noah@pivotalmedsupply.com; or (b) default under the terms of any loan agreement related to or instrument securing this Note and such default is not cured within ten (10) days after written notice to Borrower at the address set forth above, then in either such event the holder of this Promissory Note may without further notice, declare the remainder of the principal sum, together with all interest accrued thereon and, the prepayment premium, if any, at once due and payable upon written notice to Borrower.  Failure to exercise this option shall not constitute a waiver of the right to exercise the same at any other time.  The unpaid principal of this Note and any part thereof, accrued interest and all other sums due under this Note and any instrument securing this Note shall bear interest at the rate of the lesser of (a) (18%) per annum and (b) the highest interest rate permissible under applicable law, after default until paid in full (including any post-judgment period).

All parties to this Note, including Borrower and any sureties, endorsers, or guarantors hereby waive protest, presentment, notice of dishonor, and notice of acceleration of maturity and

agree to continue to remain bound for the payment of principal, interest and all other sums due under this Note notwithstanding any change or changes by way of release, surrender, exchange, modification or substitution of any security for this Note or by way of an extension or extensions of time for the payment of principal and interest; and all such parties waive all and every kind of notice of such change or changes and agree that the same may be made without notice or consent of any of them.

Upon default the holder of this Note may employ an attorney to enforce the holder's rights and remedies and the Borrower, principal, surety, guarantor and endorsers of this Note hereby agree to pay to the holder reasonable attorney's fees not exceeding a sum equal to fifteen percent (15%) of the outstanding balance owing on said Note, plus all other reasonable expenses incurred by the holder in exercising any of the holder's rights and remedies upon default.  The rights and remedies of the holder as provided in this Note and any instrument securing this Note shall be cumulative and may be pursued singly, successively, or together against the property described in any of the instruments securing the obligations under this Note or any other funds, property or security held by the holder for payment or security, in the sole discretion of the holder.  The failure to exercise any such right or remedy shall not be a waiver or release of such rights or remedies or the right to exercise any of them at another time.

This Note is to be governed and construed in accordance with the laws of the State of Texas.  Borrower irrevocably consents to the exclusive jurisdiction of the state and federal courts located in Tarrant County, Texas for all disputes relating to the interpretation or enforcement of this Note and the collection of any amount due hereunder.

IN WITNESS WHEREOF, the Borrower has hereunto set its hand and seal the day and year first above written.

**PIVOTAL MED SUPPLY, LLC,**
A Texas limited liability company


By: _____
        Noal Seitel, Operating Member

# <u>SECURITY AGREEMENT</u>

Dated: January 27, 2025

**Grant of Security Interest**. To secure the payment and performance of the Liabilities, PIVOTAL MED SUPPLY, LLC, a Texas limited liability company (whether one or more, the "Borrower", individually and collectively if more than one) pledges, assigns and grants to [Lender] (together with its successors and assigns, the "Lender") a continuing security interest in, all of its right, title and interest in the Collateral (as hereinafter defined), whether now owned or hereafter acquired and whether now existing or hereafter arising.

"Liabilities" means all obligations, indebtedness and liabilities of the Borrower whether individual, joint and several, absolute or contingent, direct or indirect, liquidated or unliquidated, now or hereafter existing in favor of the Lender including without limitation, all liabilities, all interest, costs and fees arising under or from any note, open account, overdraft, letter of credit application, endorsement, surety agreement, guaranty, credit card, lease, any monetary obligations (including interest) incurred or accrued during the pendency of any bankruptcy, insolvency, receivership or other similar proceedings, regardless of whether allowed or allowable in such proceeding, and all renewals, extensions, modifications, consolidations, rearrangements, restatements, replacements or substitutions of any of the foregoing. The Borrower and the Lender specifically contemplate that Liabilities include indebtedness hereafter incurred by the Borrower to the Lender and do not include any Liability to any affiliate of Lender including, without limitation, amounts due under the Senior Debentures.

The term "Collateral" means all of the Borrower's "accounts"; "chattel paper"; "deposit accounts" and other payment obligations of financial institutions; "documents"; "equipment", including any documents and certificates of title issued with respect to any of the equipment; "general intangibles" and any right to a refund of taxes paid at any time to any governmental entity; "instruments"; "inventory", including any documents and certificates of title issued with respect to any of the inventory; "investment property"; "financial assets"; "letter of credit rights"; all as defined in the UCC, whether owned or consigned by or to, or leased from or to the Borrower, and wherever located, securities and interests in any entities. In addition, the term "Collateral" includes all "proceeds", "products" and "supporting obligations" (as such terms are defined in the UCC) of the Collateral, including but not limited to all stock rights, subscription rights, dividends, stock dividends, stock splits, or liquidating dividends, and all cash, accounts, chattel paper, "instruments," "investment property," "financial assets," and "general intangibles" (as such terms are defined in the UCC) arising from the sale, rent, lease, casualty loss or other disposition of the Collateral, and any Collateral returned to, repossessed by or stopped in transit by the Borrower, and all insurance claims relating to any of the Collateral. The term "Collateral" further includes all of the Borrower's right, title and interest in and to all books, records and data relating to the Collateral, regardless of the form of media containing such information or data, and all software necessary or desirable to use any of the Collateral or to access, retrieve, or process any of such information or data. Where the Collateral is in the possession of the Lender or the Lender's agent, the Borrower agrees to deliver to the Lender any property that represents an increase in the Collateral or profits or proceeds of the Collateral.

The term "Lending Documents" means this Collateral Security Agreement, the Promissory Note and Collateral Assignment of Lease Agreement, both of even date, and all schedules, exhibits thereto and other documents related thereof.

The term "UCC" means the Uniform Commercial Code of Texas, as in effect from time to time.

**Representations, Warranties and Covenants**. The Borrower represents, warrants, and covenants to the Lender that each of the following is true and will remain true until termination of this agreement and payment in full of all Liabilities and agrees with the Lender that:

1.    It shall maintain the Collateral in good repair; use the Collateral in accordance with law and in compliance with any policy of insurance thereon; and exhibit the Collateral to the Lender on demand.

2.    Until the Lender gives notice to the Borrower to the contrary or until the Borrower is in default, it may use the funds collected in its business, subject to the restrictions set forth herein. Upon notice from the Lender upon default, the Borrower agrees that all sums of money it receives on account of or in payment or settlement of the accounts, chattel paper, certificated securities, negotiable certificates of deposit, documents, general intangibles and instruments shall be held by it as trustee for the Lender without commingling with any of the Borrower's other funds, and shall immediately be delivered to the Lender with endorsement to the Lender's order of any check or similar instrument. It is agreed that, at any time the Lender so elects in the event of default, the Lender shall be entitled, in its own name or m the name of the Borrower or otherwise, but at the expense and cost of the Borrower, to collect, demand, receive, sue for or compromise any and all accounts, chattel paper, certificated securities, negotiable certificates of deposit, documents, general intangibles, and  instruments, and to give good and sufficient releases, to endorse any checks, drafts or other orders for the payment of money payable to the Borrower and, in the Lender's discretion, to file any claims or take any action or proceeding which the Lender may deem necessary or advisable. It is expressly understood and agreed, however, that the Lender shall not be required or obligated in any manner to make any demand or to make any inquiry as to the nature or sufficiency of any payment received by it or present or file any claim or take any other action to collect or enforce the payment of any amounts which may have been assigned to the Lender or to which the Lender may be entitled at any time or times. All notices required in this paragraph will immediately be waived when sent. The Borrower irrevocably appoints the Lender or the Lender's designee as the Borrower's attorney-in-fact to do all things with reference to the Collateral as provided for in this agreement including without limitation (1) to sign the Borrower's name on any invoice or bill of lading relating to any Collateral, on assignments and verifications of account and on notices to the Borrower's customers and (2) to do all things necessary to carry out this agreement or to perform any of the Borrower's obligations under this agreement, (3) to notify the post office authorities to change the Borrower's: mailing address to one designated by the Lender, and (4) to receive, open and dispose of mail addressed to the Borrower The Borrower ratifies and approves all acts of the Lender as attorney-in-fact. This power of attorney appointment is irrevocable, coupled with an interest, and shall survive the death or disability of Borrower. The Lender shall not be liable for any act or omission, nor any error of judgment or mistake of fact or law, but only for its gross

2

negligence or willful misconduct. This power being coupled with an interest is irrevocable until all of the Liabilities have been fully satisfied. Immediately upon its receipt of any Collateral evidenced by an agreement, "instrument," "chattel paper," certificated "security" or "document" (as such terms are defined in the UCC) (collectively, "Special Collateral"), it shall mark the Special Collateral to show that it is subject to the Lender's security interest, pledge and assignment and shall deliver the original to the Lender together with appropriate endorsements and other specific evidence of assignment or transfer in form and substance satisfactory to the Lender.

3.      It will not, sell, lease, license or offer to sell, lease, license, grant as security to anyone other than the Lender or otherwise transfer the Collateral or any rights in or to the Collateral, except for the sale of inventory in the ordinary course of business; or change the location of Collateral from the locations of the Collateral disclosed to the Lender, all without providing at least ten (10) days prior written notice to the Lender.

**Remedies Regarding Collateral**. The Lender shall have the right to require the Borrower to assemble the Collateral and make it available to the Lender at a place to be designated by the Lender which is reasonably convenient to both parties, the right to take possession of the Collateral with or without demand and with or without process of law, and the right to sell and dispose of it and distribute the proceeds according to law. The Borrower agrees that upon default the Lender may dispose of any of the Collateral in its then present condition, that the Lender has no duty to repair or clean the Collateral prior to sale, and that the disposal of the Collateral in its present condition or without repair or clean-up shall not affect the commercial reasonableness of such sale or disposition. The Lender's compliance with any applicable state or federal law requirements in connection with the disposition of the Collateral will not adversely affect the commercial reasonableness of any sale of the Collateral. The Lender may disclaim warranties of title, possession, quiet enjoyment, and the like and the Borrower agrees that any such action shall not affect the commercial reasonableness of the sale. In connection with the right of the Lender to take possession of the Collateral, the Lender may take possession of any other items of property in or on the Collateral at the time of taking possession and hold them for the Borrower without liability on the part of the Lender. The Borrower expressly agrees that the Lender may enter upon the premises where the Collateral is believed to be located without any obligation of payment to the Borrower, and that the Lender may, without cost, use any and all of the Borrower's "equipment" (as defined in the UCC) in the manufacturing or processing of any "inventory" (as defined in the UCC) or in growing, raising, cultivating, caring for harvesting, loading and transporting of any of the Collateral that constitutes "farm products" (as defined in the UCC). If there is any statutory requirement for notice, that requirement shall be met if the Lender sends notice to the Borrower at least ten (10) days prior to the date of sale, disposition or other event giving rise to the required notice, and such notice shall be deemed commercially reasonable. Without limiting any other remedy, the Borrower is liable for any deficiency remaining after disposition of the Collateral. The Lender is authorized to cause all or any part of the Collateral to be transferred to or registered in its name or in the name of any other person or business entity, with or without designating the capacity of that nominee. The Lender shall be entitled to the appointment of a receiver as a matter of right, without notice and without regard to the value of the Collateral. Without limitation, the receiver shall have the power to (i) protect and preserve the Collateral, (ii) operate the business of the Borrower, (iii) collect and apply the proceeds, over and above the costs of the receivership, to the Liabilities, (iv) close the business of the Borrower and liquidate all Collateral, and/or (v) sell

3

the business of the Borrower as a going concern. The receiver shall serve without bond, if permitted by law. At its option the Lender may, but shall be under no duty or obligation to, discharge taxes, liens, security interests or other encumbrances at any time levied or placed on the Collateral, pay for insurance on the Collateral, and pay for the maintenance and preservation of the Collateral, and the Borrower agrees to reimburse the Lender on demand for any such payment made or expense incurred by the Lender with interest at the highest rate at which interest may accrue under any of the instruments evidencing the Liabilities. The Borrower authorizes the Lender to endorse on the Borrower's behalf and to negotiate drafts reflecting proceeds of insurance of the Collateral, provided that the Lender shall remit to the Borrower such surplus, if any, as remains after the proceeds have been applied, at the Lender's option, to the satisfaction of all of the Liabilities (in such order of application as the Lender may elect) or to the establishment of a cash collateral account for the Liabilities. The Lender shall have the right now, and at anytime in the future in its sole and absolute discretion; without notice to the Borrower to (a) prepare, file and sign the Borrower's name on any proof of claim in bankruptcy or similar document against any owner of the Collateral and (b) prepare, file and sign the Borrower's name on any notice of lien, assignment or satisfaction of lien or similar document in connection with the Collateral.

**Miscellaneous**. A carbon, photographic or other reproduction of this agreement is sufficient as, and can be filed as, a financing statement or similar record. The Borrower authorizes the Lender to file one or more financing statements or similar records covering the Collateral or such lesser amount of assets as the Lender may determine, or the Lender may, at its option, file financing statements or similar records containing any collateral description which reasonably describes the Collateral, and the Borrower will pay the cost of filing them in all public offices where filing is deemed by the Lender to be necessary or desirable. In addition, the Borrower shall execute and deliver, or cause to be executed and delivered, such other documents as the Lender may from time-to-time request to perfect or to further evidence the pledge, security interest and assignment created in the Collateral by this agreement. If any provision of this agreement cannot be enforced, the remaining portions of this agreement shall continue in effect. The provisions of this agreement are severable, and if any one or more of the provisions of this agreement are held to be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired; and the invalidity, illegality or unenforceability in one jurisdiction shall not affect the validity, legality or enforceability of such provision(s) in any other jurisdiction. Time is of the essence under this agreement and in the performance of every term, covenant and obligation contained herein. Any notices and demands under or related to this agreement shall be in writing and delivered to the Borrower at ___ and if to the Lender, shall be addressed to the address listed above (unless written notice of a change of address for notice purposes is given by the Lender to the Borrower) by one of the following means: (a) by hand; (b) by a nationally recognized overnight courier service; or (c) by certified mail, postage prepaid, with return receipt requested. Notice (other than any Subordinated Creditor Termination Notice) shall be deemed given: (i) upon receipt if delivered by hand; (ii) on the Delivery Day after the day of deposit with a nationally recognized courier service; or (iii) on the third Delivery Day after the notice is deposited in the mail. "**Delivery Day**" means a day other than a Saturday, a Sunday, or any other day on which national banking associations are authorized to be closed Any party may change the party's address for purposes of the receipt of notices and demands by giving notice of the change in the manner provided in this provision.

IN WITNESS WHEREOF, the Borrower has caused this Continuing Security Agreement to be signed and delivered under seal, and it is intended hereby that this Continuing Security Agreement constitute and have the effect of a sealed instrument under applicable law.

Borrower:

**PIVOTAL MED SUPPLY, LLC,**
A Texas limited liability company

By: _____
        Noal Seitel, Managing Member

5

## COLLATERAL ASSIGNMENT OF LEASE AGREEMENT

**THIS COLLATERAL ASSIGNMENT OF LEASE AGREEMENT** (the "**Assignment**"), dated as of January 27, 2025, is by and between **PIVOTAL MED SUPPLY, LLC,** a Texas limited liability company (the "**Assignor**") and [Lender] (the "**Assignee**").

## RECITALS

The following recitals are true and correct:

A.       Assignor has executed and delivered to Assignee a Promissory Note (the "**Note**") dated contemporaneously herewith and as security for the Note, the Assignor has executed a Security Agreement of even date therewith (herein so called) between Assignor and Assignee, granting Assignee a lien on certain personal property owned by the Assignor as is more particularly described therein (collectively, the "**Property**"). The Note, Security Agreement, and any other agreement now or hereafter evidencing, governing, or securing the Loan evidenced by the Note are hereinafter collectively called "**Loan Documents**".

B.       As further security for the Note, Assignee has required that Assignor collaterally assign to Assignee all of Assignor's right, title and interest in, to and under that certain Lease Agreement (the "**Lease**") between _____ (the "**Lessor**") and the Assignor. A true and correct copy of the Lease is attached hereto as <u>Exhibit "A"</u> and incorporated herein for all purposes. Assignor desires and intends by this Assignment to collaterally assign to Assignee all of Assignor's right, title and interest in, to and under the Lease.

**THEREFORE,** in order to secure the payment of the Note and to secure the performance and observance by Assignor of each and every term, covenant, agreement and condition contained in the Loan Documents, Assignor agrees as follows:

1.       Assignor does hereby assign, transfer and set over unto Assignee, its successors and assigns, all of the rights, title and interest of Assignor in, to and under the Lease, including without limitation, the right to make all waivers and agreements, to give and receive all notices, consents and releases, and to take such action upon the happening of a default under the Lease, including the commencement, conduct or consummation of proceedings at law or in equity as shall be permitted under any provision of the Lease or by any law, and to do any and all other things whatsoever which the Assignor is or may become entitled to do under the Lease. Notwithstanding the provisions of this <u>Section 1</u>, so long as no default shall exist under any of the Loan Documents and no event shall have occurred which by lapse of time or the giving of notice, or both, has or would become an event of default thereunder, Assignor shall have the right to enforce all rights of the Assignor under the Lease.

2.       This Assignment is made and given as security for, and shall remain in full force and effect until: (a) the payment in full of all principal and interest due on the Note; and (b) the performance and observance by Assignor of all of the terms, covenants and conditions to be performed or observed by Assignor under the Loan Documents.

3.        Assignor represents, warrants, covenants and agrees: (a) that Assignor has good right and authority to make this Assignment; (b) that Assignor has not heretofore alienated, assigned, pledged or otherwise disposed of or encumbered the Lease and Assignor has not performed any acts or executed any other instruments which might prevent Assignee from operating under any of the terms and conditions of this Assignment or which would limit Assignee in such operation; (c) that Assignor has not executed any amendment or modification whatsoever of the Lease, either orally or in writing, except as has been disclosed in writing to Assignee; (d) that Assignor shall observe, perform and discharge, duly and punctually, all and singular the obligations, terms, covenants, conditions and warranties of the Loan Documents, this Assignment and the Lease, on the part of Assignor to be kept, observed and performed; (e) to enforce, in accordance with the ordinary course of practice in the commercial leasing industry, the performance of each and every obligation, term, covenant, condition and agreement in the Lease by the Lessor to be performed; (f) to appear in and defend any action or proceeding arising under, occurring out of or in any manner connected with the Lease, or the obligations, duties or liabilities of Assignor or the Lessor thereunder in the ordinary course of practice in the commercial leasing industry, and upon request by Assignee to do so in the name and on behalf of Assignee, but at the expense of Assignor; and (g) that Assignor shall, upon the request of Assignee, execute and deliver to Assignee such further instruments and do and perform such other acts and things as Assignee may deem reasonably necessary or appropriate to make effective this Assignment and the various covenants of Assignor herein contained. In the event any warranty or representation of Assignor herein shall be false, misleading or materially inaccurate or Assignor shall default in the observance or performance of any obligation, term, covenant or condition hereof, then, in each instance at the option of Assignee, the same shall constitute and be deemed to be a default under the Loan Documents, thereby giving Assignee the absolute right to declare all sums secured thereby immediately due and payable and to exercise any and all rights and remedies provided thereunder and hereunder as well as such remedies as may be available at law or in equity.

4.        The acceptance by Assignee of this Assignment, with all of the rights, powers, privileges and authority so created, shall neither be deemed or construed to constitute Assignee a mortgagee in possession nor at any time or in any event to impose any obligation whatsoever upon Assignee to appear in or defend any action or proceeding relating to the Lease or the Property, or to take any action hereunder, or to expend any money or incur any expenses, or perform or discharge any obligation, duty or liability under the Lease, or render Assignee liable in any way for any injury or damage to person or property sustained by any person or entity in, on or about the Property.

5.        The rights and remedies of Assignee hereunder are cumulative and not in lieu of, but are in addition to, any rights or remedies which Assignee shall have under the Loan Documents, or at law or in equity, which rights and remedies may be exercised by Assignee either prior to, simultaneously with, or subsequent to, any action taken hereunder. The rights and remedies of Assignee may be exercised from time to time and as often as such exercise is deemed expedient, and the failure of Assignee to avail itself of any of the terms, provisions and conditions of this Assignment for any period of time, at any time or times, shall not be construed or deemed to be a waiver of any rights under the terms hereof.

6.      Assignor agrees to indemnify and hold Assignee harmless of, from and against any and all liability, loss, damage or expense accruing prior to the date of the Assignee's exercise of the rights hereunder, which Assignee may or might incur under or by reason of this Assignment, and of and from any and all claims and demands whatsoever accruing prior to the date of the Assignee's exercise of the rights hereunder, which may be asserted against Assignee by reason of any alleged obligation or undertaking on the part of Assignee to perform or discharge any of the terms, covenants or agreements contained in the Lease. Should Assignee incur any such liability, loss or damage under or by reason of this Assignment, or in the defense of any such claims or demands, the amount thereof, including costs, expenses and reasonable attorney's fees, together with interest thereon at the same rate of interest as provided in the Note with respect to the principal indebtedness of Assignor to Assignee, shall be secured by this Assignment and by the Loan Documents, and Assignor shall reimburse Assignee therefor immediately upon demand, and upon failure of Assignor so to do, Assignee may declare all sums secured hereby immediately due and payable.

7.      All notices, demands or documents of any kind which Assignee may be required or may desire to serve upon Assignor hereunder shall be in writing and shall be sent to the address set forth below (or such other address as the Assignor may hereafter designate for itself by notice to the Assignee as required hereby). Any such notice or communication shall be sufficient if sent by registered or certified mail, return receipt requested, postage prepaid; by hand delivery; by overnight courier service; or by telecopy, with an original by regular mail. Any such notice or communication shall be effective on (a) the date of receipt if delivered personally; (b) three (3) days after deposit in an official depository under the regular care and custody of the United States Postal Service, if transmitted by registered or certified mail, return receipt requested; or (c) the first business day after the date of deposit, if transmitted by overnight courier service, whichever shall first occur.

8.      This Assignment shall be assignable by Assignee and all representations, warranties, covenants, powers and rights herein contained shall be binding upon, and inure to the benefit of, Assignor and Assignee and their respective successors and assigns.

9.      This Assignment may be executed, acknowledged and delivered in any number of counterparts and each such counterpart shall constitute an original, but together such counterparts shall constitute only one instrument.

10.      If any one or more of the provisions of this Assignment, or the applicability of any such provision to a specific situation, shall be held invalid or unenforceable, such provision shall be modified to the minimum extent necessary to make it or its application valid and enforceable, and the validity and enforceability of all other provisions of this Assignment and all other applications of any such provision shall not be affected thereby.

**IN WITNESS WHEREOF,** Assignor has executed this Assignment as of the date first above written.

**Assignor:**

**PIVOTAL MED SUPPLY, LLC,**
A Texas limited liability company


By: _____
        Noal Seitel, Managing Member

# EXHIBIT "A"

## Lease Agreement